**FILED**

**APR 1 6 2002**

**JNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF ALABAMA
MIDDLE DIVISION

TRENNON FELLS,                              )
                                           )
    Plaintiff,                         )
                                           )
v.                                          )        Case No.: CV-01-PT-3363-M
                                           )
CONTINENTAL CASUALTY                        )
COMPANY,                                    )
                                           )
    Defendant.                         )

**ENTERED**

**APR 1 6 2002**

### MEMORANDUM OPINION

This cause comes to be heard on plaintiff Trennon Fell's Motion for Summary Judgment

on the issue of liability filed on February 14, 2002 and defendant Continental Casualty

Company's Cross Motion for Summary Judgment filed on March 29, 2002.

### FACTS

Plaintiff Trennon Fells ("Fells") was an employee of Quorum Health Group, Inc.

("Quorum"), d/b/a Gadsden Regional Medical Center ("GRMC"). Quorum entered into a

contract with Continental Casualty Company ("Continental") to provide a policy of group

insurance for its employees. Continental is the claims administrator and determines eligibility

and benefits under the terms of the contract. As an employee of Quorum, Fells was eligible for

benefits under the terms of a group long term disability ("LTD") contract of insurance.

Fells position title with Quorum was Delivery/Equipment Technician. The job summary

statement for this position indicates that a "Delivery/Equipment Technician performs delivery

and set up of equipment and supplies to the customer's home. The technician also provides

customer education with regard to products and services available." The physical/mental

requirements for this position indicate that a technician must be capable of lifting/carrying up to

*23*

100 pounds frequently during the day.  A technician is expected to walk 40% of day, sit 20% of

day and stand 40% of day.  The requirements note that a technician is expected to stoop and

bend frequently and kneel, crouch, twist, and climb stairs occasionally during the day.

On December 4, 1997, Fells was examined by Dr. William Stewart. [text continued]
Fells was injured in an automobile accident while delivering medical equipment for

Quorum on November 20, 1997.  He was seen at Occupational Health and was informed that the

x-rays revealed no fractures in his legs.  Fells was referred to Northeast Orthopedic Clinic.  On

December 4, 1997, Fells was examined by Dr. William Stewart.  The x-rays of Fells' knees were

unremarkable.  Dr. Stewart's diagnosis was "probable infrapatellar ligament injury of the right

knee from direct contusion on flexed knee."  Dr. Stewart ordered an MRI of his knees.

On December 11, 1997, Fells returned to Dr. Stewart's office.  Dr. Stewart noted that the

MRI did not show any significant intra-articular pathology.  However, Dr. Stewart indicated that

Fells had recurring effusion and a lot of crepitus on range of motion of his knee.  Dr. Stewart

initially proposed a conservative treatment plan of physical therapy to strengthen Fells' knees.

According to Dr. Stewart's office note of December 30, 1997, Fells was not able to move

beyond the first stages of his physical rehabilitation due to continued complaints of his patellar

pain.  Dr. Stewart ordered an arthroscopy of Fells' right knee.

On January 19, 1998, Fells returned to Dr. Stewart's office for a follow up of his right

knee arthroscopy.  Dr. Stewart informed Fells that the test indicated "marked traumatic

degenerative changes of the posterior aspect of his patella."  Dr. Stewart recommended a course

of physical therapy with minimum stress on the patella femoral joint.  The following three office

visits revealed that Fells was making slight improvement with the physical therapy.  By May of

1998, Fells began to develop pain in his left knee.  Dr. Stewart ordered an MRI of the left knee

after Fells office visit on May 5, 1998.  The MRI revealed distortion over the retropatellar

cartilage and small joint effusion . Dr. Stewart ordered an arthroscopy of the left knee.

On June 30, 1998, Dr. Stewart performed a left arthroscopic debridement of left knee with patella femoral chondroplasty. Dr. Stewart also performed diagnostic arthroscopy on the right knee. After these surgical procedures, Fells continued to be seen by Dr. Stewart. Dr. Stewart noted that Fells' knees showed continued improvement during his visits in July and August of 1998. During a recheck in September of 1998, Dr. Stewart indicated that Fells was doing well enough that he could start back to work with some light duty activities. Dr. Stewart limited Fells' return to half a day and placed a 40 pound weight limit on his lifting and carrying duties. Dr. Stewart did not prescribe a specific workout rehabilitation program. Instead, he indicated that Fells should just rehabilitate his legs by daily use because he was "not in a real risky occupational circumstance where he has to have super thighs anyway."

During Fells' office visits with Dr. Stewart between September and November of 1998, Dr. Stewart noted that Fells was still having trouble with his legs after his return to work for half days. He prescribed Fells a course of Decadron and noted that Fells felt a great deal better during his November office visit. However, in December of 1998 Fells returned to Dr. Stewart complaining of severe pain in his left leg. Dr. Stewart's exam revealed that Fells was developing left side sciatica with a positive sciatic stretch and a positive S1 nerve root compression. Dr. Stewart noted that Fells' abnormal walking pattern after his automobile accident had aggravated this injury. Dr. Stewart ordered an MRI.

On January 21, 1999, Fells returned to Dr. Stewart to receive the results of the MRI. Dr. Stewart informed Fells that the MRI was negative. However, Dr. Stewart stated in his notes that he believed Fells had signs of mechanical sciatic nerve irritation.

On February 15, 1999, Fells went to see Dr. Kim Garges for an evaluation. Dr. Garges

examined Fells and diagnosed him with internal derangement bilateral knees and left lower extremity radiculitis.  Dr. Garges noted that the MRI of the lumbar spine was negative.  Due to Fells' complaints of burning pain in the left lower extremity, Dr. Garges ordered an EMG/NCS to evaluate.  On February 19, 1999, Dr. Garges called Fells and informed him that the report of the EMG/NCS revealed chronic moderate to severe L5 and S1 radiculopathies on the left side.

On March 5, 1999, Fells had two procedures performed at the GRMC Radiology Department.  Fells had a "myelo-lumbar RAD" followed by a "post myelogram CT of the lumbar spine."  The myelo-lumbar RAD revealed a normal lumbar myelogram.  The bony structures were unremarkable throughout and the nerve roots appeared normal.  The post myelogram CT revealed a small central HNP at L5-S1.  This was causing "only a minimal impingement upon the anterior thecal sac and no significant lateralization to involve the neural toramina."  The nerve roots appeared normal and the bony structure unremarkable.

After these procedures, Fells continued to be treated by Drs. Stewart and Garges.  On March 10, 1999, Fells returned to Dr. Stewart complaining of a terrible post myelogram headache.  Dr. Stewart noted that Fells had a central disc herniation L5-S1 which was not evident on the MRI he ordered.  Dr. Stewart prescribed Fells some Decadron and bedrest.  On March 19, 1999, Fells returned to Dr. Garges for a report of the CT myelogram.  Dr. Gargas informed him that it showed a small central disc at L5-S1.

On March 22, 1999, Fells returned to see Dr. Stewart.  Dr. Stewart noted that Fells' "back and leg are doing about the same."  He also indicated that Fells' "headaches are fine."  Dr. Stewart also noted that his headaches were beginning to resolve a little bit and that Fells has minimal meningeal signs on his exam that day.

Fells returned to see Dr. Stewart on April 5, 1999.  Dr. Stewart noted that Fells' back leg

4

was relatively stable and that he had finally got over most of his headache symptoms. Fells complained that his knees were sore and stiff because he had not been able to be as active as usual. Fells returned to see Dr. Stewart two weeks later. Fells informed the doctor that most of his pain is relative to his leg, but that his back is still a major problem. Dr. Stewart noted that Fells did not have a surgically addressable disk lesion at that point.

On May 3, 1999, Fells had a recheck with Dr. Stewart. Dr. Stewart noted that Fells was not doing much better with his back. Dr. Stewart informed Fells that he had no surgical management prerogatives that he could exercise and recommended pain management or chiropractic treatment. On May 13, 1999, Fells visited with Dr. Stewart. Dr. Stewart recommended that Fells attend a pain management clinic. Dr. Stewart noted that he could render a "maximum medical improvement for a Grade II arthritic changes of the patella femoral joints on both knees." Dr. Stewart also stated that since Fells only had "subjective complaints without any substantiating surgical or objective circumstances relative to his back, [he could not] render much of a helpful statement in that regard." Dr. Stewart also filled out a "Physician's Statement." Dr. Stewart diagnosed Fells with bilateral patella femoral disease and a herniated L5-S1 disc. He noted a complication involving the sciatic nerve irritation due to abnormal gait secondary to Fells' knees. As for listed limitations, Dr. Stewart limited lifting to 40 pounds and instructed Fells to alternate standing, climbing, squatting, and walking. In the "Prognosis" section, Dr. Stewart wrote that Fells was "unable to return to previous employment due to listed limitations."

On May 11, 1999, Fells returned to Dr. Garges for a follow up visit. Dr. Garges examined Fells and noted that the straight leg raise test was positive on the left lower extremity to the calf. On the right side Dr. Garges found that elevation of the leg to 45 degrees caused left-

sided low back pain and left hip pain and left proximal thigh pain. Dr. Garges diagnosed Fells
with a disc protrusion L5-S1 with left lower extremity radiculitis and internal derangement,
bilateral knees. In the Plan/Discussion section of the office note, Dr. Garges stated that it was
"unlikely that Mr. Fells will improve to where he can return to gainful employment." He further
noted that Fells' "sitting and walking tolerance throughout an 8-hour day is approximately 1 to
1½ hours total."

On August 19, 1999, Dr. Garges testified in a deposition concerning Fells' medical
condition.[1] Addressing the disc herniation, Dr. Garges stated that there was a low probability of
success with surgery and that surgery would not return Fells to a reasonable level of functioning.
Dr. Garges testified that Fells has a "permanent impairment and permanent disability of the
knees as well as the radiculopathy of the nerves in the lower back." Dr. Garges also completed a
"Clinical Assessment of Pain" and "Physical Capacities Form." In the assessment, Dr. Garges
indicated that Fells would be totally restricted and unable to function at a productive level at
work due to the extent of his pain and prescribed medication. Dr. Garges also noted that little
improvement was likely and that Fells' pain would likely worsen in time. In the capacities form,
Dr. Garges indicated that Fells could only be expected to stand/walk or sit 0-2 hours in an eight-
hour workday. Additionally, Dr. Garges noted that Fells could no longer drive a company
vehicle due to his medications. As for the maximum pounds that Fells could lift/carry, Dr.
Garges noted that this section was not applicable to Fells. Finally, Dr. Garges indicated that
Fells could not bend, squat, kneel, climb or reach.

---

[1] The deposition of Dr. Garges was not taken as part of the discovery in the present action. Dr. Garges'
deposition was taken as part of the discovery in a civil action filed in the Circuit Court of Etowah County, Alabama.
The civil action was styled *QHC of Gadsden, Inc., d/b/a Gadsden Regional Medical Center v. H. Trennon Fells*, CV
No. 99-604 and *Howard Trennon Fells v. Hartford Fire Insurance Company, Inc. and James Roper Harris, et al.*,
CV No. 99-627, No. 99-604.01.

On June 6, 2000, an Administrative Law Judge issued a decision informing Fells that he was entitled to a period of disability beginning on March 5, 1999, and to disability benefits under the Social Security Act. The ALJ found that Fells' three knee arthroscopies, disc protrusion at L5-S1 with moderate to severe left leg radiculopathy and major depression were "severe" impairments under the Social Security Act.

### Administrative Proceedings

Due to the injuries sustained in the automobile accident, Fells was unable to work at Quorum from January 14, 1998 thru September 7, 1998. After Dr. Stewart released Fells to return to work on light duty, Fells worked light duty (four hours per day) from September 8, 1998 thru March 3, 1999. On March 4, 1999, Fells was unable to return to work due to the post myelogram headaches.

On June 4, 1999, Continental received a claim submitted on behalf of Fells for LTD benefits under the Quorum group policy. In support of his claim, Fells submitted the following: (1) a LTD Employer's Statement, (2) a Job Description/Performance Evaluation Tool, (3) a Physician's Statement signed by William R. Stewart, M.D., and (4) various medical records. On June 11, Quorum sent Continental information relating to Fells' wage. Using this figure, Continental determined that Fells was entitled to a gross monthly benefit of $680.34 (50% of his monthly salary of $1,360.67). On June 21, 1999, Continental sent Fells a letter informing him of their determination. After using the period from January 14, 1998 through June 12, 1998 to satisfy the policy's 150 day Elimination Period, Continental approved the following periods for Fells' disability benefits: (1) Total disability for the period from June 13, 1998 through September 9, 1998; (2) Partial disability benefit for the period from September 8, 1998 through March 3, 1999; and (3) Total disability benefit for the period from March 4, 1999 through March

22, 1999.

Continental stated the following rationale for the basis of these findings. As for the partial disability award, Continental noted that Fells worked part time from September 9, 1998 through March 3, 1999. It stated that it could not award LTD benefits because of Fells partial employment and the worker's compensation award he received for this period. Addressing the denial of LTD benefits for any period of time after March 22, 1999, Continental noted that Dr. Stewart's medical records indicated that on March 22, 1999, Fells' headaches had improved. Furthermore, it stated that Dr. Stewart did not provide it with any objective medical findings beyond March 22, 1999 that would preclude Fells from performing the substantial and material duties of his occupation as a Delivery/Equipment Technician.

On August 24, 1999, Continental received a letter from Fells requesting an appeal of the decision regarding the LTD claim. Fells did not submit any additional evidence with his appeal. On August 25, 1999, Continental sent Fells a letter acknowledging receipt of his appeal letter. Continental stated that it reviewed the information in Fells' file and was unable to reverse its previous decision. Continental informed Fells that it would forward his claim to the Appeals Committee for review and that Appeals Committee would issue a ruling within sixty days.

On November 29, 1999, the Appeals Committee sent Fells a letter informing him of the decision on administrative appeal. The Appeals Committee upheld the decision to terminate LTD benefits based on Fells' medical history:

> In order for us to determine if you are totally disabled, your doctors must be able to provide medical evidence of a disabling functional impairment that would prevent you from performing the substantial and material duties of your regular occupation.
>
> It is documented in the medical records that you were involved in a motor vehicle accident on 11/20/97 in which you sustained injuries to your knees.

Subsequently, you had difficulties with effusions and crepitus in both knees and on 6/20/98, you underwent an arthroscopic debridement with chondroplasty of the left knee and a diagnostic arthroscopy of the right knee.

You were paid full benefits commencing after the 150-day elimination period (1/14/98 through 6/12/98) to 9/7/98.

The medical documentation indicates that you had a non-complicated rehabilitation period. On 9/1/98, the records state that you have not been in physical therapy and were doing well enough to work with 40-pound weight limit. The note indicates to rehab the legs with daily use. It further states that you were not in a "real risky occupational circumstance where he has to have super thighs." You returned to work on a part-time basis and were partial paid partial disability from 9/8/98 through 3/3/99, approximately six months.

It is noted that you underwent a lumbar myelogram on 3/6/99 that was normal and a CT of the lumbar spine that showed a "small, central HNP at L5-S1." The nerve roots are normal throughout, minimal impingement upon the anterior thecal sac and no significant problem with the neural foramina. The pervious medical documentation does not support any clinical correlation, however, you did complain of sciatic "irritation" which Dr. Stewart indicates is secondary to your abnormal gait relating to your knees. There has been no EMG or NCV submitted for review to support any nerve damage. You were paid full benefits from 3/4/99 through 3/22/99 for complication of post-myelogram headaches, which are documented.

While we understand that you may have had some difficulties, the records indicate a substantial improvement in your knees and your complaints of sciatic irritation are expected to resolve. The "small, central" herniation without clinical correlation is noted however this is not considered to be disabling. The medical documentation does not support your total inability to perform your occupational duties as a Delivery/Equipment Technician which is considered a light to medium physical demand level occupation. It is further understood that you were working light/duty for a period commencing 9/8/98 through 3/399. There is nothing in the medical documentation that would support the severity of a condition or conditions that would continue to prevent you from performing your occupational duties.

The Appeals Committee informed Fells that he had exhausted his administrative remedies and that its decision was final and binding.

On July 9, 2000, Fells mailed a copy of the decision by the Administrative Law Judge for the Social Security Administration indicating that he had been awarded disability benefits. On

September 22, 2000, counsel for Fells telephoned Continental to determine whether the award of

benefits from the Social Security Administration impacted the decision to deny Fells' claim for

LTD benefits.  Counsel for Fells also informed Continental that Fells had seen other physicians

outside of his workers compensation claim, but had not notified his employer or Continental of

this fact.  On December 6, 2000, Continental sent Fells a letter in response to his request for a

second appeal.  Continental indicated that it reviewed the Social Security Award.  However, it

informed Fells that it "plays no direct role in the Company's determination of benefits."  It noted

that the Social Security Administration may use different criteria for determining disability.

Furthermore, Continental informed Fells that it had not received any documentation that would

allow it to reverse its original decision.  It notified Fells that its response completed his appeal

review.

On December 27, 2000, Fells sent another letter to Continental requesting

reconsideration.  He attached a copy of Dr. Garges' deposition in support of his plea.

On November 15, 2001, Fells filed a civil action against Continental in the Circuit Court

of Etowah County, Alabama.  Fells served the Summons and Complaint on Continental on

November 27, 2001.  On December 27, 2001, Continental filed a Notice of Removal of the

present action to this court.  This civil action involves ERISA's civil enforcement provisions.

*See* 29 U.S.C. § 1132.  Consequently, this court has subject matter jurisdiction under 28 U.S.C. §

1331.

## ARGUMENTS

Fells argues that he is entitled to summary judgment on the issue of liability because

Continental's decision to deny LTD benefits was arbitrary and capricious.  According to Fells,

the Eleventh Circuit has created a heightened arbitrary and capricious standard where the

decision maker has a conflict of interest. *See Brown v. Blue Cross and Blue Shield*, 898 F.2d

1556 (11th Cir. 1990). Furthermore, Fells argues that the Eleventh Circuit has stated in *Florence*

*Nightingale Nursing Service, Inc. v. Blue Cross Blue Shield*, 41 F.3d 1476, 1484 (1995), that

when new requirements are added for coverage, the decision is arbitrary and capricious: "A

claims administrator's decision is arbitrary and capricious where new requirements for coverage

are added to those enumerated in the plan."

   In light of these holdings, Fells argues that Continental's decision was arbitrary and

capricious because it added a new requirement of "objective" evidence of a disability for

coverage. Fells states that the definition of "total disability" in the policy is the following:

> "Total Disability" means that, during the Elimination Period and the Insured
> Employee Occupation Period shown on Statement 4 of the Application, the
> Insured Employee because of Injury or Sickness, is:
>
> (1)   continuously unable to perform the substantial and material duties of his
>        regular occupation;
> (2)   under the regular care of a licensed physician other than himself; and
> (3)   not gainfully employed in any occupation for which he is or becomes
>        qualified by education, training or experience.

Fells asserts that the Appeals Committee did not utilize this definition in its denial of benefits

because it required "objective" evidence of a disability. In support of this assertion, Fells claims

that the Appeal Committee required medical evidence of a disabling functional impairment: "In

order for us to determine if you are totally disabled, your doctors must be able to provide

medical evidence of a *disabling functional impairment* that would prevent you from performing

the substantial and material duties of your regular occupation" (emphasis added). Furthermore,

Fells notes that the Claim File Activity Sheet states that the basis for denial was "no objective

medical to extend liability beyond 3/22/99."[2]

Continental makes a cross motion for summary judgment on the issue of liability. Continental makes several arguments in support of its motion. First, it argues that the correct standard of review is the arbitrary and capricious standard because the policy confers discretionary authority upon Continental to determine eligibility and construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Although it agrees with Fells that a heightened arbitrary and capricious standard of review applies in cases where the decision maker is the insurer of the benefits at issue, it notes that his argument is incomplete. According to Continental, the court must first conduct a de novo review to determine if the benefits decision by the fiduciary was correct or incorrect. *See Brown v. Blue Cross & Blue Shield*, 898 F.2d 1556 (11th Cir. 1990). It notes that if the court determines that the ultimate decision was correct, then the inquiry ends. *See Yochum v. Barnett Banks, Inc.*, 234 F.3d 541, 544 (11th Cir. 2000). However, if the court determines that the decision was not correct from a de novo review, then it must determine what standard of review is applicable to the case. *Id.*

Second, Continental argues that its interpretation of the plan's unambiguous provision regarding the definition of Total Disability is correct. According to Continental, it interprets the applicable definition of Total Disability to mean that a claimant is entitled to benefits only if he demonstrates that he cannot perform the substantial and material duties of his former occupation. Continental argues that Fells has not disputed its interpretation of the applicable definition of Total Disability.

Third, applying its interpretation of the definition of Total Disability, Continental argues

---

[2] Fells also argues that Continental has a pattern of denying valid LTD claims of employees of Gadsden Regional. In support of this proposition, Fells attaches the *Duckett* and *Howell* opinions of this court.

that its decision to deny LTD was correct.  Continental asserts that it made its decision on the

grounds that the evidence submitted in support of the claim did not demonstrate a physical

disability of such severity that Fells could not perform the material duties of his regular

occupation.[3]  In support of this argument, Continental states that the medical evidence showed

that Fells was diagnosed with "bilateral patella femoral disease - L5-S1 herniated disc" by Dr.

Stewart with "sciatic nerve irritation due to abnormal gait."  Continental also states that Dr.

Stewart's records indicate that Fells had "a non-complicated rehabilitation period" and that on

September 1, 1998, he was released to work with a 40 pound weight limit.  It notes that Fells did

return to work on a part-time basis.  Finally, it states that the medical records indicate that the

myelogram on March 6, 1999 was normal and a CT of Fells' spine showed minor abnormalities

with normal nerve functions.  Based on this medical evidence, Continental argues that Fells was

physically capable of performing the material duties of his occupation.  Thus, it maintains that it

is entitled to summary judgment against the claims asserted by Fells.

## MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed during the pleadings,

discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A dispute is genuine "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

---

[3]   Continental points out that the scope of judicial review is limited to the evidence before the claims
administrator and plan administrator. *See Jett v. Blue Cross & Blue Shield*, 890 F.2d 1137, 1139 (11th Cir. 1989).
It notes that the evidence before it at the time of the administrative review is contained in the administrative record,
which it attached to the Second Declaration of Kelly Thorla (CNA-0247 through CNA-0334).  It is noteworthy that
the medical records of Dr. Garges and the deposition testimony are not included in these documents.  Apparently
these documents were not received by Continental until after its administrative review was concluded.

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the

initial burden of explaining the basis of his motion.  *Id.*  The non-moving party then bears the

burden of showing that there are specific facts demonstrating that there is a genuine issue of fact

for trial.  *Id.* at 324.  "When deciding whether summary judgment is appropriate, all evidence

and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the

non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999).  The

trial court must resolve all reasonable doubts in favor of the non-moving party, but need not

resolve all doubts in a similar fashion.  *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607,

609 (11th Cir. 1987).

<h3 style="text-align:center">CONCLUSIONS OF THE COURT</h3>

The court concludes that neither motion is due to be granted.  At trial, the parties should

be prepared to address the following additional issues:

(1) What response, if any, did the defendant make after receiving Dr. Garges' deposition

from Fells?

(2) If, after a "final appeal decision" there is additional evidence of total disability can

the claim consideration be reopened?

(3) What is the basis for a requirement of "objective" evidence of disability?

This _____ day of April 2002.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

14